# EXHIBIT 5
## (Judge Nickerson's Order)

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

CHAMBERS OF
WILLIAM M. NICKERSON
SENIOR UNITED STATES DISTRICT JUDGE

101 WEST LOMBARD STREET
BALTIMORE, MARYLAND 21201
(410) 962-7810
FACSIMILE (410) 962-2577

March 1, 2012

All counsel of record

Re:   Waterkeeper Alliance, Inc. v. Alan and Kristin Hudson Farm et al.
      Civil Action No. WMN-10-487

Dear Counsel:

    As you are aware, before the Court are extensively briefed and supported cross motions for summary judgment. ECF No. 104 (Perdue's), ECF No. 105 (Alan & Kristin Hudson Farm's) and ECF No. 107 (Plaintiff's). Also pending are two motions filed by Perdue to strike testimony of Plaintiff's expert witnesses. ECF No. 123 (to strike declaration of Bruce Bell); ECF No. 125 (to exclude testimony of Alex Dolgos). As for the motions to strike, the Court concludes that, while portions of the testimony of Plaintiff's experts may be entitled to limited weight, striking the entire testimony of either expert or preventing their testimony at trial is not warranted. As to the motions for summary judgment, the Court is compelled, with some reluctance, to deny all three motions.

    The motion to strike the declaration of Dr. Bell is premised primarily on the contention that his testimony has changed over time: from the opinions expressed in his initial report, his rebuttal report, his deposition testimony, and now in his declaration submitted in support of the summary judgment motion. The Court finds his opinions to have been generally consistent throughout this litigation and the inconsistencies that are present are more appropriately addressed through cross examination, not striking him as a witness.

    Perdue's motion to exclude the testimony of Mr. Dolgos is premised on Perdue's contention that he was retained to rebut Defendants' expert, Damian Preziosi, and that once Defendants withdrew Preziosi as a witness, Plaintiff's continuing reliance on Dolgos' testimony is improper. Dolgos, however, was offered to rebut evidence offered by Defendants, not to rebut a particular witness. That evidence relates to Defendants' position that Plaintiff has not established that water from the Hudson Farm makes its way into the Franklin Branch or the Pocomoke River. Notwithstanding the withdrawal of Preziosi as an expert, Defendants continue to argue for, and proffer evidence in support of, that position and, thus, Plaintiff's proffer of Dolgos to rebut that position is proper.

    Turning to the summary judgment motions, the Court notes as does Perdue that, because this case is set in for a bench trial, the Court will be the finder of fact should the case proceed to trial. Given that essentially the same evidence and argument will be presented at trial as is presented in these summary judgment motions, it might appear that the Court could resolve the dispute at this stage and spare the parties the expense of further litigation. The Court's role, however, in deciding a motion for summary judgment is significantly different than its role would be in a bench

trial.

In ruling on motions for summary judgment, the Court's role is limited. "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "A judge does not sit as a trier of fact when deciding a motion for summary judgment even if the case is scheduled to be heard without a jury." Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Technical Schs., 817 F.2d 1310, 1315 (8th Cir. 1987). Furthermore, "even if the facts are undisputed, summary judgment may not be granted where there is disagreement over inferences that can be reasonably drawn from those facts." In re Unisys Sav. Plan Litig., 74 F.3d 420, 433 (3rd Cir. 1996).

In contrast, after a bench trial, the Court is required to weigh the evidence and make credibility determinations. In re French, 499 F.3d 345, 359 (4th Cir. 2007). Rather than deciding whether a genuine issue of material fact exists, the Court makes findings of fact by evaluating the persuasiveness of conflicting evidence and "decid[ing] which is more likely true." Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999).

After carefully reviewing all the argument, testimony, and evidence submitted by the parties, the Court cannot conclude, at this stage in the litigation, that any party is entitled to judgment.

If the Court accepts the credibility of Dr. Bell and Plaintiff's other witnesses, and draws all inferences in Plaintiff's favor, the Court could conclude that, during rain events, trace amounts of chicken litter that has been blown out by exhaust fans or tracked out on tires and shoes or left on the heavy use pads is carried by the rainwater through the grass, into the swale, through the pipe at the end of the swale, into Ditch 1, and into the Franklin Branch. Of course, to come to that conclusion, the Court would need to credit Dr. Bell's testimony that water carrying this trace amount of chicken litter will keep flowing through the grass in the swale when he has also testified that water actually observed in direct contact with cow manure will simply seep into the ground near the location of the manure and not reach the ditches. Also, if the Court accepts the validity of Bell's "pathways," the Court would be hard-pressed to discern how every chicken production operation on the Eastern Shore is not in violation of the Clean Water Act (CWA). See Bell Dep. at 123, 221 (where Bell seems to suggest that poultry houses must have "decon zones" where equipment is hosed down and protective equipment and clothing is stripped off to prevent the escape of any litter).

On the other hand, if the Court credits the testimony of Defendants' expert and witnesses, and draws all inferences in Defendants' favor, the Court could conclude that the elevated levels of E. coli and fecal coliform found in the water samples came, not from trace amounts of chicken litter, but from the more than 600 tons of cow manure that is left in the fields on the Hudson Farm each year. Drawing inferences in favor of Defendants, the Court could conclude that the swale, which from the photographs submitted is clearly covered by grass, functions as a vegetative buffer. The Court could also find it significant that, in addition to the swale between the poultry houses, another water source (Ditch 3, which flows from the cow pasture and by which dozens of cattle walk every day) also entered Ditch 1 between the two sampling points (HF03 and HF02) where the substantial increase in E. coli and fecal coliform levels was observed on January 26, 2010. The Court notes that the subsequent Waterkeeper samples provide even less insight into the relative contribution of the poultry versus the cattle operations as those samples were taken from a location where additional runoff from Field 15, a cow pasture, could have added to the waterflow. See

Pl.'s 45, Fig. 3.

As counsel might detect, there are elements of this litigation that the Court finds disturbing. Particularly from the deposition testimony of former Plaintiff Kathlyn Phillips and the documents referenced in that deposition, it seems clear that the original Plaintiffs in this action were looking for an opportunity to bring a citizen suit under the CWA against some chicken production operation under contract with a major poultry integrator. When Phillips discovered a large pile on the Hudson Farm that she believed to be chicken litter, she concluded that she had found her "BAD APPLE." After the pile proved to be something other than chicken litter, Phillips continued to represent, apparently without any evidence, that the pile was tainted with chicken manure. Plaintiff's case has now gone from a large pile of uncovered chicken manure to small amounts of airborne litter from the exhaust fans, trace amounts brought out on shoes and tires, and a dustpan of litter left on the heavy use pads.

The Court also notes that Plaintiff appears strategically selective in the manner in which it has defined the offending Concentrated Animal Feeding Operation (CAFO). Perdue strenuously objects to Plaintiff's statement that "'[i]t is an incontrovertible fact that the Alan and Kristin Hudson Farm is a CAFO.'" Perdue's Opp'n at 13 n.7 (quoting Pl.'s Mot. at 30). Plaintiff makes this statement, however, because earlier in its memorandum it equated "the Alan and Kristin Hudson Farm" with "the Facility," and, furthermore, seemed to limit the scope of "the Facility" to an "animal feeding operation" located within the larger "Ro-Mar-Len Farm." Pl.'s Statement of Facts ¶ 1. Plaintiff then indicates that "the Facility" includes the two poultry houses, the manure storage shed, and the two-bin composter: all structures connected with the chicken operation. Id. ¶¶ 6, 8. For most of its briefing, Plaintiff limits the scope of the CAFO to the chicken operation.

Although delegated to a footnote, Plaintiff begins to argue in its Opposition, however, that the Hudson's cattle operation might also be part of the CAFO. Pl.'s Opp'n at 19 n.116. While minimizing throughout its briefing of the summary judgment motions any contribution from cow manure to the pollution discharge, Plaintiff wants to "retain the right," should its motion be denied, to argue that "discharges from the cows are, indeed, violations of the CWA." Id. Acknowledging the contribution of the cow manure at this stage of the litigation, of course, would be inconsistent with Plaintiff's goal of extending liability to Perdue. The Court notes it would also seem to be beyond the scope of the Notice of Intent which was clearly limited to poultry waste. See Compl., Ex. A at 1 (citing "discharge of pollutants associated with poultry waste" as the CWA violation).

While the Court's concerns regarding Plaintiff's motivations might not be relevant at this stage in the litigation, the course that this litigation has taken might have relevance when it comes to imposing any fine under 33 U.S.C. § 1319(d), should the Court find a CWA violation. In imposing a civil penalty, the Court is instructed to consider "the seriousness of the violation, . . . any good-faith efforts to comply with the applicable requirements, . . . and other such matters as justice may require." Id. Should the Court find no violation, it is noted that the statute permits attorney's fees to be awarded to "any prevailing or substantially prevailing party." 33 U.S.C. § 1365(d). While certainly rare, it is not unprecedented that attorney's fees can be awarded to a prevailing defendant in a CWA citizen suit. See Sierra Club v. Cripple Creek & Victor Gold Mining Co., 509 F. Supp. 2d 943, 951 (D. Colo. 2006).

The undersigned is aware that the parties met last year with a magistrate judge in an attempt to settle this matter and were unsuccessful. Some discovery was still ongoing at the time and the

summary judgment motions were yet to be briefed. While this case is currently scheduled for trial to begin on April 16, 2012, the Court would certainly try to accommodate a request of the parties to meet again with a magistrate to attempt to resolve this dispute now that the case is more completely developed and before additional litigation resources are expended.

Finally, to the extent that this litigation is intended to be a learning experience for the students from the University of Maryland clinic, I feel obliged to make a comment regarding the briefing submitted on behalf of Plaintiff. Plaintiff's summary judgment motion was 48 pages with 341 footnotes; Plaintiff's Opposition, 49 pages with 288 footnotes; Plaintiff's Reply, 24 pages with 138 footnotes. Submitting briefs near the maximum page limit permitted under the Local Rules but with 767 single-spaced, small-fonted footnotes not only circumvents the spirit if not the letter of the Local Rules, but also makes for less than compelling advocacy. While this style might be appropriate for legal journals that few attempt to read, it is not helpful in the context of litigation.

The pending motions, ECF Nos. 104, 105, 107, 123, and 125, are denied. Notwithstanding the informal nature of this correspondence it is an order of the Court and will be docketed as such..

                                                          Sincerely,

                                                          /s/
                                                          _____
                                                          William M. Nickerson
                                                          Senior United States District Judge

cc: Court File